DETERMINED IN THE

## THIRD DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

### DURING THE YEAR 1922.

---

### Albert Gerard and Sam Laird, Appellees, v. James C. Davis, Director General of Railroads, Appellant.

CARRIERS—*liability of carrier to whose line shipment diverted for losses beyond own line.* Where the initial carrier of a carload of hogs was, because of an embargo on hogs, unable to deliver them at their original destination and, on direction of the person in charge of them, diverted the car to a different carrier to be transported to a different destination, the carrier to which the shipment was diverted did not become the initial carrier so as to be liable for loss occurring beyond its own line.

Appeal from the Circuit Court of Pike county; the Hon. HARRY HIGBEE, Judge, presiding. Heard in this court at the October term, 1921. Reversed. Opinion filed April 22, 1922.

S. F. BLANC and WILLIAM and BARRY MUMFORD, for appellant; J. A. CONNELL, of counsel.

WILLIAMS & WILLIAMS, for appellees.

(377)

MR. JUSTICE GRAVES delivered the opinion of the court.

This was an action brought by Albert Gerard and Sam Laird against James C. Davis, United States agent under the transportation act, representing the Chicago, Burlington & Quincy Railroad Company, in the circuit court of Pike county, to recover damages alleged to have resulted from failure upon the part of the railroad company to deliver in proper time a shipment of hogs from New Salem, Illinois. A trial was had before a jury and verdict rendered in the sum of $723.50 in favor of Gerard et al., and against the railroad company, upon which judgment was rendered and this appeal followed.

The facts in the case are not controverted to any considerable extent and seem to be in substance as follows: Appellees shipped over the Wabash Railway from New Salem, Illinois, 106 hogs which were billed to Indianapolis, Indiana, and took from that railroad company a bill of lading in the usual form. The train on which the hogs were shipped left New Salem about 7:30 on the morning of December 9, 1918, and the hogs were then in good condition. Shortly after leaving New Salem the conductor of the Wabash Railroad notified Mr. Laird, one of the appellees who was on the train in charge of the hogs and also in charge of a load of cattle billed to Chicago, that there was an embargo in force on hogs at Indianapolis and that the hogs could not be delivered in the market there, and suggested that the hogs be unloaded at Griggsville, Illinois. Mr. Laird was anxious to have the hogs go to some market where there was no embargo in force and on being informed that the East St. Louis market was open he, with others similarly circumstanced on the same train, decided to have his hogs transferred from the Wabash Railroad to the Chicago, Burlington & Quincy Railroad at Chapin, Illinois, and shipped to East St. Louis over the C., B. & Q. The 106 hogs of

appellees occupied one car, so that no unloading was
necessary at Chapin, but the car could be and was
transferred by the Wabash Railroad Company to the
C., B. & Q. Railroad Company on a track provided for
the purpose of making such transfers. At Chapin the
Wabash Railroad Company and the C., B. & Q. Rail-
road Company cross each other and have a depot used
in common by them and together have only one agent.

The train on the Wabash Railroad reached Chapin
in the afternoon and there the car of hogs of appellees,
with other cars of stock, was transferred to the track
of the C., B. & Q. Railroad for shipment to East St.
Louis. At Chapin, Mr. Laird, one of the appellees,
who also had a carload of cattle in the train which was
billed to Chicago, decided to proceed to Chicago with
his cattle over the Wabash and asked a Mr. Hook, who
was also shipping hogs and, like Mr. Laird, was
anxious to get his hogs to an open market, to look after
his hogs for him, Laird. Mr. Hook was going on to
East St. Louis with his own hogs and was to care for
the hogs involved as well as his own. At Chapin, Mr.
Laird turned his contract of shipment over to Mr.
Hook, and Mr. Hook went to the depot used in common
as before stated, and there made inquiry of the agent
as to the time when they could get their hogs to East
St. Louis, and produced the contract that appellees
had turned over to him. Thereupon the agent took the
contract and having asked Hook to what firm in East
St. Louis the hogs were to be consigned changed the
contract so that the car was consigned to East St.
Louis, Illinois, and noted upon the contract that the
shipment was diverted at Chapin, Illinois, by order of
shipper December 9, 1918, and consignment made to
C. E. White & Company, East St. Louis, Illinois.

Thereupon the car of hogs was shipped over the C.,
B. & Q. to East St. Louis, Illinois, where it was turned
over to the East St. Louis Junction Railway Company
for delivery to the consignee, and because of delay in

delivering by the last-named railroad company several of the hogs died and several of them were damaged, and it was charged that because of such delay the C., B. & Q. was liable to the shippers for such loss.

It is not necessary to recite the evidence any further in detail for the reason that the controversy here involved must be determined upon the issue of whether or not the C., B. & Q. Railroad Company, by reason of the change in shipment at Chapin, and what was there done, became an initial carrier and liable for damages arising not only while in charge of the shipment but for loss accruing on forwarding lines, or became simply a forwarding line and therefore liable only for such damages as might result while the property was in transit on its line.

There is no charge of loss or injury while the hogs were in transit over the C., B. & Q. Railway as shipment seems to have been made in due time by such railway company from Chapin to East St. Louis, where it was delivered in good condition to the East St. Louis Junction Railway Company, an independent railroad company, to be delivered to the consignee. The hogs were delivered in good condition by the C., B. & Q. Railway Company to the Junction Company about 6:30 on the morning of December 10, but were not delivered by the latter company until after 11:00 o'clock p. m., a period of nearly seventeen hours, when it was found that the damage sued for had taken place. There seems to be no question made that the injury sustained arose from the neglect of the Junction Railway Company to water the hogs during the time from 6:30 a. m., to 11:00 o'clock p. m., and from the failure to deliver said hogs to the consignee within a reasonable time after receipt by the Junction Railway Company.

If the C., B. & Q. Railway Company is liable for the damages resulting from the negligence of the East St. Louis Junction Railway Company, then it must be

upon the ground that, because of what transpired at Chapin and what was there done, the C., B. & Q. Railway Company became and was the *initial* carrier and was not acting in the capacity of forwarder only. The trial court adopted the view that the appellant was the initial carrier and refused to give instructions asked by appellant, which stated in effect that no recovery could be had unless the damages sued for were caused by appellant while the property was being transported over appellant's railroad, and refused to instruct the jury that in order to recover appellees must prove that the damage complained of must have been the result of delay, neglect or improper handling on the line of the C., B. & Q. Railway Company. In this action we think the trial court was in error.

An initial carrier is liable for loss caused by a diversion of shipment to a connecting carrier, but we know of no law that makes a mere forwarder liable for any damages, except such as may arise from injury while the property is in the charge of the forwarder. In this case we hold, under all the evidence that the Wabash Railroad Company did not end its initial contract of shipment at Chapin, but undertook by diversion to fulfil a contract which it had undertaken, that the change made in the contract did not make the C., B. & Q. Railway Company the initial carrier. No new contract was made or attempted, but the original contract of shipment altered by one having the authority to make the change, only so far as was necessary to change the destination from a point where the Wabash Railroad Company could not deliver the shipment to a point where such railroad company through its forwarding line could make delivery. A diversion or reconsignment of property in transit would, in the usual course of business, seem to rest rightfully upon the railroad company which was under contract to deliver, especially so in a case where the carrier could not, for good reasons, deliver at the point contracted for.

The judgment of the circuit court is reversed, but the cause is not remanded.

*Judgment reversed.*